UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ROBERT WILSON,** | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 06cv00199 |
| | ) |
| **GREG FIRKUS, Acting Warden, Logan** | ) **Judge Ruben Castillo** |
| **Correctional Center,** | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Illinois prisoner Robert Wilson ("Petitioner") is serving a 30-year sentence for first

degree attempted murder. (R. 1, Pet. for Writ of Hab. Corp. at 1.) He has filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that was denied his right to present

a defense under the Sixth Amendment when the state court excluded evidence that someone else

committed the crime with which he was charged. (*Id.* at 5-6.) Respondent argues that the Court

cannot reach Petitioner's claim on the merits because it is procedurally defaulted. (R. 19, Ans. at

7-14.) After carefully considering the petition (R. 1) and memorandum in support thereof (R. 15-

1), the answer (R. 19), reply (R. 22), and all supporting documents submitted by the parties, we

find that Petitioner's Sixth Amendment claim is not procedurally defaulted, and further that he

has satisfied the standards for relief set forth in 28 U.S.C. § 2254(d). As a result, we grant the

petition for federal habeas relief.

## RELEVANT FACTS

In reviewing a petition for federal habeas relief, the court must presume that the state

court's factual determinations are correct unless the petitioner rebuts those facts by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). We have gleaned the facts of this case from the petition and appendix thereto, along with portions of the state court record Respondent provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.

## A.    *The Attack on June Siler*

At approximately 7:45 p.m. on February 28, 1997, June Siler, a 24-year-old white woman, was ending her shift as a nurse at Michael Reese Hospital on Chicago's south side. (R. 21, Record, Ex. I (Report of Proceedings 11/2/99) at C60-C62.)[1] Following her usual routine, she walked two blocks to a bus stop at 29th and King Drive. (*Id.* at C61, C92.) Shortly after she entered the bus shelter, a man approached from the south. (*Id.* at C63.) He walked into the shelter and asked Siler how long she had been waiting for the bus. (*Id.* at C63, C66.) Siler responded that she had just arrived but had seen the #7 bus pass. (*Id.* at C66.) She then turned to look down the street to see if another bus was coming. (*Id.* at C68.) As she turned back, the man grabbed her from behind and put her in a headlock. (*Id.* at C69-C70.) As she struggled to escape, the man pulled out a box-cutter and cut her several times in the face and neck. (*Id.* at C71-C73.)

---

[1] Citations to (R. ___.) refer to the record number that a document is assigned on the docket sheet for this case. The record, as submitted to the Court, was a significant source of some confusion in this case. The bulk of the trial transcripts are found at R. 21, Record, Ex. I at C1-C182, D1-D149, E1-E275 and H1-H7. Portions of the transcripts from pretrial and trial proceedings bear the same label, i.e., two sets of documents labeled with a "D" and "E." For the sake of clarity, we indicate that we are referring to the pretrial proceeding transcripts where applicable. Also, the Common Law Record has page numbers labeled with a "C," the same label given to a portion of the trial transcript; for ease of reference we refer to the Common Law Record as "CL." Additional portions of the Common Law Record, specifically pages CL46-CL64, can be found in Petitioner's Appendix at Exhibit J. The Court notes that much confusion could have been avoided if the parties had simply labeled each page of the records submitted in ascending numerical order.

She eventually broke free and fell to the ground, screaming as loud as she could. (*Id.* at C73-C76.) The man dropped the box-cutter, then picked it up and ran south down King Drive, the same direction from which he had come. (*Id.* at C75-76.)

Siler made her way back to Michael Reese Hospital. (*Id.* at C77.) Upon reaching the emergency room, she met up with an attending nurse, who asked her what happened. (*Id.* at C77-C78, C122-C124.) Siler responded, "He came up and cut me and I don't know why." (*Id.* at C122.) Siler was bleeding profusely from her face and neck. (*Id.* at C126, C129-C130.) During her treatment in the emergency room she was given a number of medications, including sedatives, morphine, an antibiotic and a tetanus shot. (*Id.* at C131-C132.) After being stabilized she was transferred to another hospital to undergo surgery. (*Id.* at C126.)

At approximately 1:30 a.m. on March 1, 1997, when Siler was recovering from surgery, she spoke to two police officers and gave them a description of her attacker. (*Id.* at C79-C80.) She described him as a black male in his 20s, about 5 feet 7 inches, thin build, with a mustache and a medium complexion. She said he was wearing a stocking cap, a hooded sweatshirt with the hood pulled over the stocking cap, dark pants, a black three-quarter-length jacket and black velcro gym shoes. (*Id.* at C79-C81.)

Chicago Police Detective James O'Brien was one of the officers assigned to investigate the attack on Siler. (*Id.* at C136.) On March 1, 1997, the evening following Siler's attack, Detective O'Brien and his partners began conducting a rolling surveillance of King Drive from 26th to 35th Street in unmarked police cars. (*Id.* at C144.) At approximately 7:50 p.m., the officers saw Petitioner standing at the same bus stop where Siler had been attacked. (*Id.* at C145.) He fit the same general description given by Siler in that he was a black male,

3

approximately the same height and build described by Siler, and he was wearing dark clothing. (*Id.* at C145-C146.) The officers immediately stopped Petitioner and patted him down. They discovered a .38 caliber revolver in his jacket pocket and a "butterfly type knife" with a broken handle in his back pants pocket. (*Id.* at C147.) They placed him under arrest and transported him to the police station. (*Id.* at C148-C149.)

Upon arriving at the police station, Petitioner was photographed and interviewed by police. (*Id.* at C149.) He was questioned about the attack on Siler but denied any involvement. At approximately 9:00 p.m., Detective O'Brien and the other officers returned to the hospital to speak with Siler. (*Id.* at C82-83, C150.) Detective O'Brien showed Siler photographs of five different men, including the photograph taken of Petitioner. (*Id.* at C83-C85, C150-C151.) Siler identified Petitioner as the man who had attacked her. (*Id.* at C85.)

Following Siler's identification, the officers returned to the jail to question Petitioner further. (*Id.* at E97, C149-C150.) Over the course of the next 24 hours, Petitioner was questioned extensively by various police officers and two prosecutors, and was told that Siler had positively identified him as her attacker. (*Id.* at E97-98.) Some time later, the officers informed Petitioner that another victim had come forward, a man named Kenneth Frost, who had apparently seen Petitioner's photograph on the evening news[2] and had come to the police station to report that he had an altercation with Petitioner on a bus on the city's west side in early February 1997. (*Id.* at C6-C31, E1-11.) Frost picked Petitioner out of a photographic line-up while at the police station. (*Id.* at C9.)

_____

[2] Although it is not entirely clear from the record, a local news station apparently showed a photograph of Petitioner during a broadcast on March 1 in connection with a story about Siler's attack. (*Id.* at B13, C9, E1-E14.)

4

Approximately 28 hours into his detention, Petitioner was interviewed by Assistant State's Attorney ("ASA") William Healy. (*Id.* at D8, D38.) Prior to his interview with Petitioner, ASA Healy had spoken with one of the officers involved in the investigation and had read several police reports regarding the details of Siler's attack. (*Id.* at D7.) During his interview with ASA Healy, Petitioner agreed to make a statement. (*Id.* at D10.) After Petitioner made an oral statement, ASA Healy prepared a detailed written statement of the confession. (*Id.* at D14.) After ASA Healy wrote out the statement, Petitioner reviewed and signed it. (*Id.* at D14-D17.)

### B. Petitioner's Confession

At approximately 2:00 a.m. on March 3, 1997, Petitioner's written confession was completed, and stated as follows: At the time of his arrest, Petitioner was 41 years old and lived in an apartment by himself at 1815 W. Monroe in Chicago. (*Id.* at D20.) At 7:45 p.m. on February 28, 1997, he left his girlfriend's apartment at 2822 S. Calumet and walked to the bus stop at 29th and King to catch the bus home. (*Id.* at D21.) Petitioner saw a young woman wearing a green coat and a red backpack standing alone at the bus stop. He walked past her and stood inside the bus shelter. He asked her how long she had been there and she said not long, and that the #4 bus had just gone by. (*Id.* at D21-D22.) He was smoking a cigar and blew smoke in her direction, whereupon she told him "those things cause cancer." (*Id.* at D22.) This angered Petitioner so much that he wrapped his arm around her neck, pulled out a utility blade from his back pocket, and cut her in the face and neck three or four times. (*Id.* at D22-D24.) He then ran west away from the bus stop, and threw the utility knife on the ground as he ran. (*Id.* at D24.) Although he had the butterfly knife in his back pocket, he did not use this knife in the attack

5

because the blade was too dull. (*Id.* at D23.) He rode the bus part of the way home and walked the rest of the way. (*Id.* at D25.) When he got home, he called his girlfriend and then went to bed. (*Id.*) The following day, he arrived at his girlfriend's house around 6:00 p.m. and left to return home around 6:45 p.m. (*Id.*) He was wearing the same clothes as the day before. (*Id.*) He was at the bus stop at 29th and King Drive waiting to catch the bus when police arrested him. (*Id.*)

Despite Petitioner's confession, there was no physical evidence linking him to the attack on Siler. Police searched Petitioner's and his girlfriend's apartments, but never found the box-cutter or any bloody clothing belonging to the Petitioner, nor did they find any black velcro gym shoes like those described by Siler. (*See id.* at B14, C48, C168.)

### C. Jerryco Wagner's Crime Spree

At approximately 8:20 p.m. on the evening of March 1, 1997—less than an hour after Petitioner was arrested—a man was attacked while waiting for a bus at 35th and King Drive, six blocks from where the attack on Siler occurred. (*Id.* at B5-B6, D3-D37; R. 6, Pet. Ex. J (Portion of Common Law Record) at CL46-CL48, CL60-CL64.) The victim, Manual Guzman, reported to police that while he was at the bus stop, a man approached from the south and upon entering the bus shelter asked him, "How long have you been waiting for the bus?" (R. 6, Pet. Ex. J. at CL60.) A moment later, without warning, the man grabbed Guzman from behind and stabbed him in the neck. (*Id.*) He then fled the scene. Guzman described the man as a black male in his 20s, medium complexion, approximately 5 feet 7 inches, 140 to 150 lbs., and wearing a dark coat. (*Id.* at CL47, CL60; Pet. Ex. L. (Police Report) at 1; R. 21, Ex. I (Report of Proceedings 4/21/99) at B6.)

6

Over the course of the next two weeks, four more people—all of them white—were attacked within a roughly one-and-a-half-mile radius by a man matching the description given by Guzman. There was no apparent motivation for any of the attacks, and none of the victims were robbed or sexually assaulted. Elizabeth Weinstein and Virginia Johnson, two college students working on an assignment for their journalism class, were attacked by a man with an ice pick at 400 E. 39th Street. (R. 6, Pet. Ex. J at CL46-CL48; Pet. App. Ex. M (Police Report).) There was no apparent provocation for the attack. Margarita Harwell was stabbed in the left shoulder by a man with a knife for no apparent reason as she was returning home near 339 E. 34th Street. (R. 6, Pet. Ex. J at CL47.) The final attack occurred on March 15, 1997, when Melanie Hopp was stabbed by a man who approached her from behind as she was putting items in her car at 605 E. Oakwood. (*Id.*) Her attacker was caught by police while fleeing the scene. (R. 21, Record, Ex. I at C47, B8; R. 6, Pet. Ex. N (Police Report).)

The man was subsequently identified as Jerryco Wagner, a 21-year-old African-American man who resided at 37th Street and Oakley Boulevard in Chicago. (R. 21, Record, Ex. I at B12; R. 6, Pet. Ex. J at CL46-CL48; Ex. M-N.) He was 5 feet 7 inches and 140 lbs., and at the time of his arrest was wearing black velcro shoes. (R. 21, Record, Ex. I at B14.) Thus, he matched the description Siler had given police of her attacker. When questioned by police, Wagner confessed to attacking Guzman, Hopp, Weinstein, Johnson, and Harwell, stating that God had ordered him to kill each of the victims because they were white.[3] (*Id.* at B8; R. 6, Pet. Ex. J at CL47.) There is nothing in the record to suggest that the police ever questioned Wagner about the attack on

_____

[3] Wagner told police that he had approached Guzman, who is Hispanic, believing he was white. He reported that he subsequently realized Guzman was Hispanic but that God commanded him to kill Guzman anyway. (R. 6, Pet. Ex. L.)

Siler.

Wagner was subsequently found unfit to stand trial and sent to a mental institution. (R. 6, Pet. Ex. J at CL47.) During his incarceration, he stabbed another inmate with a ballpoint pen. (R. 21, Record, Ex. I at B13.)

### D.    Petitioner's Request for Discovery and Motion in Limine

Prior to trial, Petitioner filed a discovery motion styled, "Motion for Court Order to Release Psychiatric and Psychological Records for Jerryco Wagner." (R. 21, Record, Ex. I at CL40-CL42.) Petitioner sought Wagner's medical records along with "all reports, memoranda, summaries or other writings relative to Jerryco Wagner." (*Id.* at CL42.) The trial court ordered Wagner's psychological records to be tendered to the court for an *in camera* inspection. (*Id.* at CL39.) What that inspection revealed is not included in the record before us. It is also not clear from the record exactly what, if any, documents related to Wagner were turned over to the defense.

A few months after the trial court's resolution of the discovery motion, defense counsel filed a motion in limine seeking permission to present evidence to the jury about Jerryco Wagner's crime spree. (R. 6, Pet. Ex. J at CL46-CL48; R. 21, Record, Ex. I at CL46-CL52, B1-B36.) Petitioner intended to argue that Wagner, not Petitioner, was the person who attacked Siler based on Wagner's *modus operandi* of stabbing white people for no apparent reason; the temporal and geographic proximity of Wagner's crimes to the attack on Siler; the fact that Wagner's physical appearance matched the description given by Siler—in the defense's view better than it fit Petitioner, since Siler had repeatedly told police her attacker was in his 20s; and the fact that Wagner was wearing black velcro gym shoes exactly like the ones described by Siler

8

at the time of his arrest. (R. 21, Record, Ex. I at B1-B36.) Defense counsel placed particular

emphasis on the attack on Guzman, which happened in a nearly identical manner, one day apart,

at the same time of day, and only six blocks away from where Siler was attacked. (*Id.*; R. 21,

Record, Ex. I at CL60.) The prosecution objected to the admission of any evidence pertaining to

Wagner, arguing that the evidence "is irrelevant and should be excluded due to its remoteness,

uncertainty, and its unfair prejudicial nature." (R. 6, Pet. Ex. J at CL50.)

After an oral hearing, the trial court excluded all evidence regarding Wagner from the

trial, concluding that it was not relevant. (R. 21, Record, Ex. I at B25-26.) The court stated:

> I can see where some of this evidence might possibly be
> available to the defense if there were some—if you had some
> differences than what the fact pattern that was described to me. For
> example, if one of the people there, Jericho [sic] Wagner, confessed to
> having committed that person, say, identified your client instead of
> Wagner, after Wagner confessed to that . . . or a situation where [Siler]
> had picked out Wagner instead of your client, after your client had
> confessed to this case; it might trigger some additional issues that
> would, you know, bear closer scrutiny. But what you have is Wagner
> confessing to his things; your client confessing to his things; an
> identification made as to your client by that one victim, or actually two
> victims. But these other victims that were assaulted by Wagner,
> basically identified Wagner.
>
> It is two different fact patterns, basically. Even though I think
> you are trying to establish that [Siler's] case was part of the Wagner
> fact pattern. But there is no evidence—any evidence—what you are
> trying to show is with evidence that is, in fact, too remote and
> too—would be prejudicial and not relevant to the facts of this case. So
> the motion in limine is denied.

(*Id.* at B25-26.)

Defense counsel filed a motion asking the trial court to reconsider its ruling, citing the

Illinois Supreme Court's decision in *People v. Cruz*, 643 N.E.2d 636 (Ill. 1994), in which the

9

court held that prejudice to the prosecution is not a relevant factor in deciding whether to admit defense evidence regarding a third party's guilt. (R. 6, Pet. Ex. J at CL60-CL64; R. 21, Record, Ex. I at D1-39 (Report of Proceedings 6/18/99) (Pretrial Proceedings).) Defense counsel also argued that the court in its discretion could admit some of the evidence regarding Wagner's crimes, particularly evidence regarding the attack on Guzman, while excluding other evidence that was more remotely connected to Siler's attack. (R. 21, Record, Ex. I at D33-36.)

The trial court determined that it would reconsider its original ruling in light of the *Cruz* case, and then stated that it had, "analyzed it now pretty much in terms of is there significant probative value and is there substantial linkage between the case—the acts cited by the defense with the other defendant to show either identification or modus operandi. . . . [M]y ruling is that there is insufficient linkage to bring in that evidence." (*Id.* at D36-D37.)

### E.      The Trial

At trial, the state presented testimony from Siler, who gave a detailed account of the attack and her identification of Petitioner from the photo array, indicating that he was wearing the same coat in the photograph that he had worn during the attack. She also made an in-court identification of Petitioner as the man who had attacked her. (*Id.* at C59-C91.) In contrast to Petitioner's confession, Siler did not describe any exchange with her attacker regarding cigar smoke. (*See id.* at C67.) Instead her testimony was that the man attacked her for no apparent reason after asking her how long she had been waiting for the bus. (*Id.* at C67-C68.)

During cross-examination, defense counsel showed Siler an enlarged photograph of a pair of black velcro gym shoes. Upon questioning, Siler identified the shoes as the same type worn by her attacker. (*Id.* at C102.) The trial court prohibited defense counsel from asking Siler

10

whether the shoes were the exact ones worn by her attacker. (*Id.* at C102-C103.) At a sidebar conference, defense counsel informed the court that the picture depicted the shoes Jerryco Wagner was wearing at the time of his arrest. (*Id.* at C115-C116.) Defense counsel renewed his request to present evidence regarding Wagner's crime spree; the trial court denied this request. (*Id.* at C116-17.)

The state also presented testimony from Detective O'Brien, who described the circumstances surrounding Petitioner's arrest, Siler's out-of-court identification of Petitioner, and the events leading up to Petitioner's confession. (*Id.* at C135-C178.) Over the defense's objection, Detective O'Brien was allowed to testify that Petitioner had a loaded .38 caliber revolver and a knife in his possession at the time of his arrest. (*Id.* at C146-C147.) During his testimony, Detective O'Brien acknowledged that police had found a broken razor blade at the crime scene but had not tested it for fingerprints or any other type of forensic evidence. (*Id.* at C138, C164.)

ASA Healy, now a professor of evidence at DePaul University Law School, testified regarding the details of Petitioner's confession. (*Id.* at D4-D44.) His testimony was that Petitioner voluntarily gave an oral inculpatory statement, and that he had carefully prepared the written statement, going over it with Petitioner line-by-line for accuracy. (*Id.* at D10-D35.) ASA Healy acknowledged that he had spoken with Detective O'Brien and read several reports regarding the details of Siler's attack before speaking with Petitioner and preparing the written confession. (*Id.* at D7, D36.)

In his defense, Petitioner called his girlfriend Jane Thomas as a witness. (*Id.* at D101-D147.) She testified that in February 1997 she lived at 2822 S. Calumet with her three sons, then

11

ages 6, 8, and 10. (*Id.* at D102-D104.) She testified that Petitioner was the father of her children and was helping her to raise them. (*Id.* at D102-D109.) She stated that on February 28, 1997, she called Petitioner to wake him up around 3:00 a.m. as was her usual practice. (*Id.* at D105-D106.) He arrived at her apartment a few hours later to help her get the children ready for school. (*Id.* at D107-D108.) At around 6:30 a.m. Petitioner walked her and their son James to the bus stop at 29th and King Drive. (*Id.* at D108-D110.) She took the bus with James to his day care center and then took another bus to her job at a McDonald's several miles away. (*Id.* at D110-D111.)

She later received a call from Petitioner at work; he asked her to come straight home after her shift because he was not feeling well. (*Id.* at D113.) She got off work at 2:30 p.m. and took the bus home. (*Id.* at D113-14.) When she arrived Petitioner was there. They spoke briefly, she gave him a bus transfer, and they then left together. (*Id.* at D114.) Thomas walked to the day care center to pick up her children, spent some time there, and returned home around 5:30 p.m. (*Id.*) Petitioner called her around 6:30 p.m. (*Id.* at D114-15.) She called him later that evening around 9:00 p.m. to see how he was feeling. (*Id.* at D115.)

She testified that Petitioner came to her home the following day, and spent a short time there visiting the children. (*Id.* at D117-D118.) The last time she saw him was when he left her apartment that evening. (*Id.* at D118.) Later that night two police detectives came to her door and asked her questions about Petitioner. (*Id.* at D120-D121.) Thomas consented to a search of her apartment. (*Id.* at D121.) The officers searched her apartment and took a black jacket with them when they left. (*Id.* at D121-D122.)

Petitioner introduced telephone records corroborating Thomas's account. The records

12

indicated that a one minute call was placed from Petitioner's phone to Thomas's phone at 6:22 p.m. on February 28, 1997, and a three minute call was placed from Thomas's phone to Petitioner's phone at 9:02 p.m. that same night. (*Id.* at D97-D98.)

Petitioner then took the stand in his own defense. (*Id.* at E15-123.) He testified that in February 1997, he lived alone with his cat at 1815 W. Monroe. (*Id.* at E16-E17.) His day on February 28, 1997, started like most others, as he woke in the early morning hours to begin the roughly one-hour bus and train ride to the bus stop at 29th and King Drive near Thomas's apartment to help her get the children off to school. (*Id.* at E18-E23.) He arrived while the children were still asleep. Around 6:30 a.m. Petitioner walked Thomas and their youngest son to the bus stop at 29th and King Drive and waited with them until they boarded the bus. (*Id.* at E23-E24.) He returned to Thomas's apartment and after getting the other two boys ready, walked them to school. (*Id.* at E24-E25.) He then went back to the apartment to take a nap; he suffered from asthma and high blood pressure, and was not feeling well that day. (*Id.* at E25-E26.)

At approximately 2:30 p.m., Petitioner picked up the two eldest boys from school and brought them back to the apartment. (*Id.* at E27-E28.) Around 2:45 p.m., Thomas arrived home from work and gave Petitioner a bus transfer to use for the ride home. (*Id.* at E28.) After speaking a short time they left together around 3:15 p.m., and Petitioner returned to the bus stop at 29th and King Drive to wait for the bus. (*Id.*) The trip home took a little over an hour, and he arrived at his apartment around 4:30 p.m. (*Id.* at E29-E30.) Once home, he listened to the radio and rested, as he was still not feeling well. (*Id.* at E30.) He called Thomas at approximately 6:22 p.m., and then spent the rest of the evening listening to music. (*Id.* at E31.) Around 9:00 p.m.,

13

he received a call from Thomas, who wanted to know how he was feeling. (*Id.* at E32-E33.)

The next day, March 1 (which was a Saturday), Petitioner went to visit Thomas and the children around 6:00 p.m. (*Id.* at E34.) He stayed only about half an hour so that he could take advantage of an expiring bus transfer. (*Id.* at E34-E35.) At approximately 6:35 p.m., he returned to the bus stop at 29th and King Drive to wait for the bus. (*Id.* at E34-E35.) He was there only a few minutes when three police officers pulled up in an unmarked car, jumped out with their guns drawn, and patted him down. (*Id.* at E35.) At the time he was carrying a .38 caliber revolver and a pocket knife for protection. (*Id.* at E36-E37.) The detectives found his pocket knife but not his gun. (*Id.* at E36-E37.) He was handcuffed and taken to the police station. (*Id.* at E38.) At the time of his arrest, Petitioner was wearing black lace-up work boots. (*Id.* at E47-E49.)

At the station police Petitioner produced his handgun and gave it to the officers. (*Id.* at E41-E42.) Upon discovering the weapon, Detective O'Brien and another officer pulled their guns and pointed them at Petitioner. (*Id.* at E42.) They were angry and told him he "almost came close to getting shot." (*Id.*) They took his picture and questioned him about the attack on Siler. (*Id.* at E42-E44.) He denied involvement and consented to a search of his apartment. (*Id.* at E46-E47.) After questioning, police took him down to the "bullpen." (*Id.* at E52.) They permitted him to keep the inhaler he used to treat his asthma. (*Id.* at E44-45.) He needed the Procardia tablets he took for high blood pressure, but he did not have the medication with him. (*Id.* at E45-E46.) He testified that he had asked the officers to retrieve the Procardia tablets from his apartment while they were searching it; however, they did not do so. (*Id.* at. E52, E86.) Later that evening Petitioner was questioned by ASA Ursula Walowski, accompanied by one of the police officers, and was told that Siler had identified him in a photographic line-up. (*Id.* at E97-

14

E98.) He did not confess. (*Id.* at E100-E101.)

By the next day, March 2, Petitioner had been in custody more than 24 hours. He testified that he was sick and scared. He had eaten only two baloney sandwiches during his detention. (*Id.* at E57, E85-86.) He did not know whether it was day or night because both the bullpen and the interrogation room were dark. (*Id.* at E52-E53.) His blood pressure was high and he needed his Procardia tablets. (*Id.* at E45-E50.) During the interrogation, the police officers made threatening gestures as if they were going to hit him. (*Id.* at E50-E52.) At one point, one of the officers slapped him. (*Id.* at E52, E86.)

In the early morning hours of March 3, Petitioner was questioned by ASA Healy. (*Id.* at E108-E110.) He again denied any involvement in the attack. (*Id.* at E109.) ASA Healy then made comments Petitioner took to mean that the officers were going to beat him up. (*Id.* at E56-E57.) Petitioner estimated Detective O'Brien's size as around 6'4" and 275 lbs. (*Id.* at E41.) Petitioner believed that in light of his own size and health problems, he would not survive a beating by police. (*Id.* at E57.) He testified that ASA Healy told him he would only spend a year in jail if he confessed. (*Id.* at E56, 86.) Petitioner told ASA Healy that he would make a statement. (*Id.* at E56.) He and ASA Healy then went to another room where ASA Healy wrote out the entire statement, with Petitioner adding some of the details—including the exchange about the cigar smoke—and ASA Healy filling in the rest. (*Id.* at E57-E85, E112-D14.) Petitioner testified that contrary to his written statement, he did not stab Siler and was not involved in the attack in any way. (*Id.* at E32.)

On cross-examination, Petitioner admitted that he knew there were "lies" in the statement he had given to ASA Healy. (*Id.* at E112.) The prosecutor asked him, "[W]ould it be fair to

15

characterize you as a liar?" Petitioner responded, "If you like to, yes." (*Id.*) Over the defense's objection, and despite a prior ruling that the Kenneth Frost incident was not admissible, the court permitted the prosecutor to ask Petitioner whether he was told he had been identified not only in the attack on Siler but also "in a line up in an incident involving Kenneth Frost." (*Id.* at E110, E112.) Petitioner admitted that he had been told he was identified in the Kenneth Frost incident. (*Id.* at E110.)

The state then presented rebuttal testimony from Detective O'Brien, who disputed Petitioner's testimony in several respects. He testified that the police found Petitioner's handgun immediately upon patting him down at the bus stop. (*Id.* at E169.) He denied that the police ever mistreated Petitioner, threatened him, slapped him, intimidated him, or showed him how the victim had been cut. (*Id.* at E166-171.)

ASA Healy also testified in rebuttal, denying that he told Petitioner the police were going to beat him up, that he should confess, or that he would only serve one year in jail. (*Id.* at E139-43.) ASA Healy further testified that Petitioner was not mistreated by police in his presence, and had made no complaints to him about his health. (*Id.* at E139-E143.)

The state also called Isabelle Castro, a nurse at Cook County jail who had assessed Petitioner's health at the time of his admission on March 3. (*Id.* at E131-E133.) The intake record she prepared indicated that Petitioner was in good health. (*Id.* at E135-E136.) The record did not mention that Petitioner had requested Procardia upon his intake at the jail; however, "Procardia" was written on the second page of the form. Castro surmised that this had been written by a doctor who spoke with Petitioner after she interviewed him. (*Id.* at E135-E138.)

Following the close of evidence, the case proceeded to closing arguments. During

16

closing, the prosecutor referred to Petitioner several times as a "liar." (*Id.* at E192, E225-E240.)
In the defense argument, counsel stated that Petitioner "had to lie to get himself out of that police station in one piece." (*Id.* at E200.) As to the photograph of Wagner's shoes, defense counsel stated, "[W]e don't know whose picture this is, we don't know who is the rest of this photo but I'll tell you one thing, it ain't Robert Wilson." (*Id.* at E197.) In rebuttal the prosecutor stated, "First of all, we don't know whose shoes those are, they very well could be the defendant's." (*Id.* at E236.) Defense counsel objected stating, "He knows they're not the defendants" and "he knows who they belong to." (*Id.*) The prosecutor objected to defense counsel's comments. (*Id.* at E237.) The court overruled defense counsel's objection and sustained the prosecution's objection. (*Id.* at E237.)

After completion of jury instructions, the case went to the jury around 5:45 p.m. that evening. (*Id.* at E262.) Approximately one hour later, the jury requested a transcript of Siler's testimony and the medical intake form completed by Nurse Castro upon Petitioner's admission at the jail. (*Id.* at E267, E270.) Both of these requests were denied. (*Id.* at E270, E272.) The following day, the jury returned a verdict of guilty. (*Id.* at H3.)

Approximately one month later, one of the jurors wrote a letter to the trial court stating that she had been unduly pressured by the other jurors into changing her vote to guilty. (*Id.* at I1-4; CL108.) The defense moved for a new trial on this and other bases, including the exclusion of the Jerryco Wagner evidence; the trial court denied all of the defense's post-trial motions. (*Id.* at I4-6; R. 6, Pet. Ex. K (Portion of Common Law Record) at CL91-CL94.) Petitioner was thereafter sentenced to the maximum term of 30 years in prison. (R. 21, Record, Ex. I at I23.) His motion to reconsider the sentence was denied. (*Id.* at J1-4.)

17

### F.    Petitioner's Direct Appeal and State Post-Conviction Proceedings

Petitioner appealed his conviction and sentence to the Illinois Appellate Court, raising the following arguments: the trial court denied him his right to present a defense by excluding the evidence regarding Wagner's crime spree; the court denied him a fair trial by admitting evidence of the unrelated weapons in his possession at the time of his arrest; the court erred in allowing the prosecutor to ask him whether he had been identified in a lineup in the incident involving Kenneth Frost; the court erred in permitting the prosecutor to ask him if he was a liar; and the court erred in permitting the prosecutor to repeatedly call him a liar and make other improper comments during closing argument. (R. 21, Record, Ex. A (Petitioner's Brief On Appeal) at 5.)

On March 21, 2002, the Illinois Appellate Court issued an opinion affirming Petitioner's conviction and sentence. (R. 6, Pet. Ex. B (Decision of Illinois Appellate Court dated March 21, 2002).) The court agreed that the trial court had erred in admitting the evidence regarding Petitioner's possession of weapons unrelated to the offense. (*Id.* at 8-9.) The court nonetheless found this error harmless in light of the "substantial" evidence of Petitioner's guilt. (*Id.* at 9.) The court found no merit to any of Petitioner's other arguments. (*Id.*)

Petitioner filed a *pro se* petition for leave to appeal in the Illinois Supreme Court, arguing that he was denied a fair trial when the court excluded evidence that someone else had committed the crime; the court erred in admitting the evidence of the gun and knife in his possession at the time of his arrest; the court erred in allowing the prosecutor to ask him about the Kenneth Frost incident; and the court erred in allowing the prosecutor to make improper comments during closing argument. (R. 21, Record, Ex. C (Petitioner's Petition for Leave to Appeal).) The Illinois Supreme Court summarily denied his petition. (R. 6, Pet. Ex. C (Notice of Denial of

18

Petition for Leave to Appeal in the Illinois Supreme Court dated Oct. 2, 2002).)

Petitioner thereafter filed a *pro se* post-conviction petition with the trial court. (R. 6, Pet. Ex. D (Notice of Filing and Certificate of Service for Petition for Post-Conviction Relief).) He raised ten issues in his petition, including claims involving ineffective assistance of counsel and a claim that the trial court had erred in refusing to admit evidence of Wagner's crime spree. The trial court summarily dismissed the petition. (R. 6, Pet. Ex. E (Circuit Court Order Dismissing Petition for Post-Conviction Relief dated Nov. 14, 2003).) The court found that all of the claims were waived or barred by the doctrine of *res judicata*, except the ineffective assistance claim, to which the court found no merit. (*Id.* at 5-6, 8.) Petitioner, through appointed counsel, appealed the dismissal to the Illinois Appellate Court. (R. 21, Record, Ex. D (Petitioner's Brief).) In his appellate brief, Petitioner argued that waiver and *res judicata* were improper bases for a summary dismissal, and further that his petition stated "the gist of a constitutional claim" of ineffective assistance of counsel such that counsel should have been appointed for him. (*Id.* at 16.) The appellate court affirmed the dismissal of Petitioner's post-conviction petition, finding that all of Petitioner's claims had been waived. (R. 6, Pet. App. Ex. F (Decision of Illinois Appellate Court dated June 16, 2005).) Petitioner filed a petition for leave to appeal in the Illinois Supreme Court, which was summarily denied. (R. 6, Pet. App. Ex. G (Denial of Petition for Leave to Appal to Illinois Supreme Court dated Sept. 29, 2005).)

Petitioner filed the current Petition pursuant to § 2254 on January 13, 2006. He raises one claim: He was denied his right to present a defense under the Sixth and Fourteenth Amendments when the trial court excluded the evidence regarding Jerryco Wagner's crime spree.

19

## LEGAL STANDARDS

This Petition is governed by the provisions of the Anti-Terrorism and Death Penalty Act

of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district

court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court

judgment "only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(a). The court can only grant an application for

habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim–
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.

Under this deferential standard, we must "attend closely" to the decisions of state courts and

"give them full effect when their findings and judgments are consistent with federal law."

*Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law

if the state court arrives at a conclusion opposite to that reached by the Supreme Court or if the

state court reaches an opposite result in a case involving facts materially indistinguishable from

relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may

grant habeas relief under the "unreasonable application" clause if the state court identifies the

correct legal principle from Supreme Court precedent but unreasonably applies that principle to

the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). For a state court's

decision to be unreasonable, it must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.*

## ANALYSIS

### I. Procedural Default

Before considering the merits of a habeas petition, a federal court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The exhaustion requirement is premised on concerns of comity; the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must "fairly present" his constitutional claims in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To satisfy this requirement, an Illinois prisoner like Petitioner must raise his claims in the appellate court as well as in a petition for discretionary review in the Illinois Supreme Court. *See Boerckel*, 526 U.S. at 845. The petitioner also must have raised the same claim in state court that is raised in the federal petition. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). To fairly present a claim in state court, the petitioner must present the state court with both the operative facts and the controlling legal principles on which the claim is based, and must also alert the state court that he is raising a claim based on federal law. *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004); *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001).

Even if a petitioner has exhausted all state court remedies, his claim may nonetheless be barred under the related doctrine of procedural default. The procedural default doctrine, also

21

rooted in comity concerns, precludes a federal court from reaching the merits of a habeas petition when either: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state law procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514. In other words, when a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted. *Boerckel*, 526 U.S. at 853-54.

Here, Respondent argues that Petitioner's Sixth Amendment claim is procedurally defaulted because he did not fairly present the claim in state court; specifically, he did not adequately alert the state court to the federal nature of his claim. (R. 19, Ans. at 9-10.) Respondent believes that Petitioner failed to fairly present his claim in his brief filed with Illinois Appellate Court and in his *pro se* petition for leave to appeal filed in the Illinois Supreme Court. (*Id.* at 10.) Petitioner counters that he did adequately present the claim in his state court filings. (R. 22, Pet. Reply at 1-5.)

Consideration of the procedural default issue requires close scrutiny of Petitioner's state court filings. In the fact section of the brief filed with the Illinois Appellate Court, Petitioner, through his appointed counsel, provided the details regarding the offense of conviction, Wagner's crime spree, his attempt to introduce evidence regarding Wagner's crimes, and the trial court's exclusion of this evidence. (R. 21, Record, Ex. A at 6-21.) His first argument was labeled, "Defendant was denied the right to present a defense by the exclusion of evidence about Jerryco Wagner." (*Id.* at 1, 22.) In this section he argued that the Wagner evidence was highly

22

relevant to the primary issue at trial but nonetheless improperly kept from the jury. (*Id.* at 22.) He argued, "Fairly considered, the trial court abused its discretion and denied the defendant the right to present a defense," and in support cited "U.S. Const., Amends. VI, XIV; Ill. Const. 1970, Art. I, sec. 2." (*Id.*) Respondent argues that this language was insufficient to fairly present the claim because Petitioner framed the bulk of his argument in terms of state evidentiary law and relied primarily on state cases. (R. 19, Ans. at 13-15.)

In considering whether a claim was fairly presented in state court, a federal habeas court must strive to avoid "hypertechnicality." *Verdin v. O'Leary*, 972 F.2d 1467, 1480 (7th Cir. 1992). A petitioner need not cite "book and verse on the federal constitution" to fairly present his claim; instead he must simply present the "substance" of his federal claim in the state courts, *Picard*, 404 U.S. at 278, and must "in some manner, alert the state courts to the federal underpinnings of his claim." *Perruquet*, 390 F.3d at 519. The Seventh Circuit has developed a detailed framework for analyzing whether a claim was fairly presented in state court. The court must consider whether petitioner (1) relied on federal cases employing constitutional analysis; (2) relied on state cases applying constitutional analysis to a similar factual situation; (3) asserted the claim "in terms so particular as to call to mind a specific constitutional right"; or (4) alleged a pattern of facts that is "well within the mainstream of constitutional litigation." *Verdin*, 972 F.2d at 1473-74; *Perruquet*, 390 F.3d at 519-20; *Sweeney*, 361 F.3d at 332. None of these factors alone are determinative, and the court must "consider the specific facts of each case." *Verdin*, 972 F.2d at 1474.

As is discussed above, in his appellate brief Petitioner identified all of the operative facts surrounding his claim; specifically, that third-party exculpatory evidence was excluded from the

23

trial. He also cited to the relevant provisions of the U.S. Constitution, the Sixth and Fourteenth Amendments, and argued that the state court's ruling denied him his right to present a defense. Aside from specifically mentioning the federal constitutional provisions at issue, Petitioner framed his claim in terms so particular as to call to mind a specific constitutional right: the right to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense. . . . [T]his right is an essential attribute of the adversary system itself." ); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). Petitioner also alleged a pattern of facts—the exclusion of evidence regarding a third party's guilt of the crime—that is well within the mainstream of constitutional litigation. *See Chambers*, 410 U.S. at 297-302; *see also Green v. Georgia*, 442 U.S. 95, 97 (1979) (exclusion of co-defendant's inculpatory statement indicating that he acted alone in committing the crime violated Due Process Clause). Based on these considerations, we find that Petitioner fairly presented his Sixth Amendment claim in the Illinois Appellate Court.

Petitioner's *pro se* filing in the Illinois Supreme Court poses greater difficulty. (R. 21, Record, Ex. C.) The handwritten petition was prepared without the assistance of counsel and therefore must be given liberal construction. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed"); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*pro se* documents are held to "less stringent standards than formal pleadings drafted by lawyers"); *Coulter v. Gramley*, 93 F.3d 394, 397 (7th Cir. 1996) ("it is important to construe *pro se* filings liberally").

We must first consider whether Petitioner presented the state court with the operative facts surrounding his claim. In the fact section Petitioner stated, in pertinent part, "Within two weeks and a mile and half, a black man named Jericho Wagner had stabbed five other people, acting on orders from God to kill white people. . . . Defendant also sought to offer evidence that Wagner resembled Siler's description of the offender, that Siler indicated to the detectives that the man that stabbed her was wearing black Velcro shoes, and that when Wagner was arrested after one of the incidents he was wearing black Velcro shoes." (*Id.* at 3-4.) Although the petition is not a "model of legal draftsmanship," *see Coulter*, 93 F.3d at 397, Petitioner adequately alerted the state court to the relevant facts surrounding his claim, namely, that there was evidence another individual may have committed the crime for which he was convicted.

Regarding the legal basis of his claim, Petitioner does not dispute that he did not cite to the U.S. Constitution or any federal cases analyzing the Sixth Amendment right to present a defense. (R. 22, Pet. Reply Br. at 4.) Nonetheless, as the Seventh Circuit has held, there are other means of fairly presenting a federal claim in state court. *Verdin*, 972 F.2d at 1480; *Perruquet*, 390 F.3d at 519-20. In the argument section of his brief, Petitioner discussed the law

25

regarding a defendant's attempts to prove that someone else committed the crime with which he is charged. (R. 21, Record, Ex. C at 4.) He cited three state cases addressing the admission of third-party exculpatory evidence, including *People v. Maberry*, 549 N.E.2d 974, 982-83 (Ill. App. Ct. 1990). In that case the defendant had argued he was denied the right to present third-party exculpatory evidence to the jury in violation of the Sixth Amendment of the U.S. Constitution. The *Maberry* court discussed a criminal defendant's right under the Sixth Amendment "to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* The court cited the Supreme Court's opinions in *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) and *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), the seminal cases establishing a defendant's Sixth Amendment right to present a defense. Although the appellate court in *Maberry* ultimately determined there was no error in the exclusion of evidence, the court acknowledged and made reference to the constitutional claim in a factual scenario quite similar to Petitioner's own case. The citation of this state case weighs in favor of a finding that Petitioner fairly presented his Sixth Amendment claim. *See Verdin*, 972 F.2d at 1480-81; *Perruquet*, 390 F.3d at 519-20.

At bottom, the Court's task is to determine as a practical matter whether it is probable that the state court was alerted to the federal nature of the Petitioner's claim. *See Verdin*, 972 F.2d at 1475. Considering the *pro se* petition as a whole, and giving it liberal construction as we must, we find this standard to be met. In a subsequent portion of his petition Petitioner argued, "Defendant was not giving [sic] a fair trial; because of evidence which the defendant could not present to the jury about my innocent [sic] of the crime. Prior crimes within that area by the

26

same individual." (R. 21, Record, Ex. C at 7-8.) Although this argument is not artfully drafted, Petitioner's reference to a "fair trial" in relation to the trial court's exclusion of evidence regarding another person's culpability for the offense is so particular as to call to mind a specific constitutional right, namely, the right to present a defense. *See Chambers*, 410 U.S. at 294-96. Similarly, Petitioner alleged a pattern of facts—the exclusion of evidence regarding a third party's guilt—that is well within the mainstream of constitutional litigation. *See id.*

In *Verdin*, the petitioner did not specifically cite to the federal constitution or any U.S. Supreme Court cases, but cited to state cases that made reference to or analyzed the U.S. Constitution. *See Verdin*, 972 F.2d at 1480. He also argued that he had been denied his right "to be present at critical stages of his trial" and his right "to a fair trial." *Id.* The Seventh Court found that this satisfied the fair presentment requirement, and therefore petitioner had fairly presented a Sixth Amendment claim in state court. *Id.; see also Sweeney*, 361 F.3d at 333 (claim was fairly presented despite reformulation of claim in federal court because petitioner's "underlying legal theory and the facts on which it is based have remained the same throughout his post-conviction odyssey.") After a thorough consideration of all the relevant factors, we conclude that Petitioner fairly presented his Sixth Amendment claim in the Illinois Supreme Court.[4] Accordingly, the claim is not barred by the doctrine of procedural default.

---

[4] Petitioner also suggests that the Illinois Supreme Court should have been aware of the federal nature of the claim due to the proceedings in and opinions issued by the lower state courts. (R. 22, Pet. Reply Br. at 5.) We believe, however, that such an argument is foreclosed by the Supreme Court's holding that state court judges cannot be required to look beyond the petitioner's brief, such as to lower state court opinions, to ascertain whether the petitioner is raising a federal claim. *See Baldwin*, 541 U.S. at 27-28.

Because of this conclusion, the Court need not reach Petitioner's argument that the miscarriage of justice exception to the procedural default doctrine applies here because he is actually innocent of the offense. *See Schlup v. Delo*, 513 U.S. 298, 327-29 (1995). For the same reason, Petitioner's request for discovery and an evidentiary hearing to further develop his actual innocence claim is unnecessary, and is denied without prejudice on this basis. (R. 23.) With the procedural questions resolved, the Court turns to the merits of Petitioner's claim.

## II.    Sixth Amendment Right to Present a Defense

The Sixth Amendment Compulsory Process and Confrontation Clauses, made applicable to the states through the Fourteenth Amendment's Due Process Clause, guarantee a criminal defendant "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, — U.S. —, 126 S.Ct. 1727, 1731 (2006). "Few rights are more fundamental than that of an accused to present witnesses in his own defense," and indeed, "this right is an essential attribute of the adversary system itself." *Taylor*, 484 U.S. at 408. The right to present evidence is not unlimited, however, and is subject to "reasonable" restrictions imposed by the state court. *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Chambers*, 410 U.S. at 295 ("[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.").

Here, Petitioner argues that the exclusion of the evidence regarding Jerryco Wagner's crime spree denied him his Sixth Amendment right to present a defense. (R. 15, Pet. Br. at 17-23.) Errors in state law, especially those regarding the admission or exclusion of evidence, are ordinarily beyond the scope of federal habeas review. *Estelle v. McQuire*, 502 U.S. 62, 67-69 (1991); *Perruquet*, 390 F.3d at 510-11. Nonetheless, a criminal defendant possesses a federal

28

due process right to a fair trial, and state evidentiary errors will rise to the level of a federal due process violation if they are so serious that they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). Here, Petitioner alleges that the state's evidentiary ruling was so erroneous as to have deprived him of a fair trial, and resulted in the conviction of one who is innocent; he has thus stated a cognizable due process claim. *See Perruquet*, 390 F.3d at 512.

Determining that a claim is cognizable does not mean the claim is necessarily meritorious, however. *Id.* A state court's rulings or procedures that serve to exclude evidence will not abridge a defendant's Sixth Amendment right to present a defense unless they are "arbitrary" or "disproportionate to the purposes they are designed to serve." *Scheffer*, 523 U.S. at 308. Nonetheless, the "denial or significant diminution" of the defendant's right to present a defense "calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined." *Chambers*, 410 U.S. at 295 (internal quotation marks and citation omitted). Moreover, in applying its evidentiary rules the state court must "evaluate whether the interests served by a rule justify the limitations imposed on the defendant's constitutional right" to present evidence. *Rock v. Arkansas*, 483 U.S. 44, 56 (1987).

The Seventh Circuit has developed a balancing test to resolve the conflict between the defendant's right to present a defense and the state's right to regulate the presentation of evidence in its courts. *Johnson v. Chrans*, 844 F.2d 482, 484 (7th Cir. 1988); *see also Stephens v. Miller*, 13 F.3d 998, 1004 (7th Cir. 1994) (applying balancing test articulated in *Johnson*); *United States ex. rel. Galvan v. Gilmore*, 997 F. Supp. 1019, 1033 (N.D. Ill. 1998) (same). In *Johnson*, the court described the test as follows:

Our assessment goes beyond merely reciting broad formulations of countervailing constitutional interests. We examine the justifications for excluding or admitting particular evidence in a particular case. A colorable claim that the application of state evidentiary rules has interfered with a defendant's right to present a defense triggers an assessment whether these legitimate state interests, such as interests in preserving order, in excluding unreliable evidence and in maintaining control over court procedures, are materially advanced by the exclusion of certain evidence. . . . On the other side of the balance, we also examine carefully the significance of the contested evidence to the defendant's case. . . . The strength of defendant's argument that state rules of evidence, rather than the defendant's right to present exculpatory evidence, should give ground depend largely on the importance of the evidence.

*Id.* at 484-85 (citations omitted). In determining whether the appellate court's decision

upholding the exclusion of the Jerryco Wagner evidence involved an unreasonable application

of clearly established federal law, *see Wiggins*, 539 U.S. at 520, we must give careful

consideration to both the state's justifications for excluding the evidence and the significance of

this evidence to Petitioner's case.

In upholding the exclusion of the Wagner evidence, the appellate court determined that

Petitioner failed to establish a "close connection" between Wagner and the attack on Siler. The

court held:

While a defendant may attempt to prove that someone else committed the crime with which he was charged, that right is not without limitations. People v. Lewis, 165 Ill.2d 305, 341, 651 N.E.2d 72, 89 (1995). Such evidence is admissible only if a close connection can be demonstrated between the third person and the commission of the offense. People v. Maberry, 193 Ill.App.3d 250, 263, 549 N.E.2d 974, 982 (1990). This court will not reverse the trial court's decision regarding whether a close connection exists absent a clear abuse of discretion. People v. Kidd, 147 Ill.2d 510, 535, 591 N.E.2d 431, 442 (1992).

We find no abuse of discretion in the instant case. While defendant points to the fact that Wagner had shoes similar to those described by the victim, that he resembled the physical description given by the victim, and that the other

30

stabbings took place in the same general vicinity within a short period of time, this evidence fails to establish any connection between Wagner and the attack on Siler on February 28.

Wagner's physical description differs from the description given by Siler of her attacker whom she described as having a mustache. The weapon used to attack Siler, a box-cutter, was different from the weapons used by Wagner, who apparently told authorities that he only used a knife and an ice pick in committing his crimes. There was no evidence placing Wagner at the bus stop at the time of the attack. Moreover, defense counsel elected not to show Siler the photograph of Wagner to determine if he was her attacker as the court had allowed. Accordingly, we find no abuse of discretion.

(R. 6, Pet. Ex. B at 7-8.) As is apparent from the above passage, and as Respondent

acknowledges, the state appellate court did not articulate a countervailing state interest, such as

preserving order or maintaining control over court procedures, to support the exclusion of the

Wagner evidence. (See R. 19, Ans. at 28.) Although Respondent is correct that no Supreme

Court case requires the state court to specifically identify its interest in excluding the evidence,

this court must give consideration to the state's articulated justification, or in this case the lack

thereof, in determining whether the decision to exclude the evidence was arbitrary. See

Chambers, 410 U.S. at 295; Johnson, 844 F.32d at 484-85.

The crux of the state court's holding was that the Jerryco Wagner evidence did not satisfy

the state's "close connection" standard for introduction of third-party culpability evidence. (R. 6,

Pet. Ex. B at 8 (citing cases).) The court is aware of no basis, nor does Respondent provide one,

to indicate that a state may permissibly require a heightened standard of probity instead of

traditional rules of relevance when the defendant seeks to offer evidence regarding a third party's

guilt. Indeed, the Supreme Court recently held that a state court violated the defendant's Sixth

Amendment right to present a defense when it excluded evidence of a third party's culpability for

31

the crime by analyzing the evidence under a test that skewed ordinary rules of relevance. *Holmes*, 126 S. Ct. at 1731. In *Holmes*, the South Carolina Supreme Court had determined that certain third-party exculpatory evidence was not admissible because "where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence of an appellant's guilt, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." *Id.*

In reversing, the U.S. Supreme Court observed that although state court judges are permitted to exclude evidence that is "repetitive," "only marginally relevant," or "poses an undue risk of harassment, prejudice, or confusion of the issues," the analysis applied by the South Carolina court did not further any of these interests; instead of focusing on the probative value or potential adverse effects of admitting third-party exculpatory evidence, the state court's inquiry rested solely on the strength of the prosecution's case. *Id.* at 1732-33. This analysis did not rationally serve the purpose of state evidentiary rules, namely, "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 1734. For this reason, the state court rule was arbitrary and unconstitutional. *Id.* at 1735.

Similarly, here, to the extent the state court in Petitioner's case was applying a rule that altered the ordinary relevancy rules in the case of third-party exculpatory evidence, such a rule would not be constitutionally permissible. Nonetheless, Respondent urges, and we tend to agree, that upon close examination it is apparent that the use of the "close connection" language notwithstanding, the state court was essentially concerned with admission of evidence that it found too remote. Exclusion of evidence that is unreliable or of marginal relevance to the case at hand is a legitimate state interest. *Holmes*, 126 S. Ct. 1732-33. We must consider then whether

32

this interest was "materially advanced" by the exclusion of the Jerryco Wagner evidence. *See Johnson*, 844 F.2d at 484-85.

The state appellate court concluded that despite the similarities in physical descriptions and the details of attacks committed by Wagner, the evidence "fail[ed] to establish any connection between Wagner and the attack on Siler on February 28." (R. 6, Pet. Ex. B. at 8.) Upon review, it is unclear from the record what sort of "connection" the court found lacking. The evidence proffered by Petitioner showed that Wagner admitted committing five unprovoked stabbing attacks on white people within a two-week period and within a roughly one mile radius of the attack on Siler. The attack on Manual Guzman was very closely linked to the Siler attack; Wagner attacked Guzman at a bus stop six blocks directly south of where Siler was attacked (and ironically, within the area police were conducting surveillance following her attack), approximately 25 hours after the attack on Siler, at the same time of day, and in nearly the identical manner: he approached the victim, who was waiting at a bus stop, asked the victim how long he had been waiting for the bus, and then without provocation and for no apparent reason, attacked him from behind with a sharp object, stabbing him in the neck. There was clearly a "connection" between Wagner and the attack on Siler that occurred on February 28.

While it is true that Petitioner did not proffer evidence showing that Wagner was seen at the bus stop the night of Siler's attack, that is not the standard for admissibility. As Petitioner argues in his brief, state evidentiary law permits the prosecution to introduce other crimes evidence under a *modus operandi* theory to establish identity, knowledge, intent, motive, design or plan on the part of the defendant. *See People v. Taylor*, 463 N.E.2d 704, 712 (Ill. 1984). In *Taylor*, the defense had argued that the other offenses were too dissimilar to the crime charged,

33

because there were certain differences in the location and the manner in which the crimes occurred. *Id.* The Illinois Supreme Court held: "While obviously some differences between the three cases exist, we have never held . . . that other crimes must be identical to the crime charged before evidence of them is admissible . . . Certainly some dissimilarity will always exist between independent crimes." *Id.* The court went on to state that "substantial similarities" in the crimes existed in that they all occurred within a one-block area and a four-day period; each had occurred in the early evening hours; in each case the defendant appeared to be carrying the same weapon; and in each case the defendant searched the victims. These similarities tended to establish defendant's placement near the scene of the crime, his motive, and his intent to commit robbery. *Id.* As such, the evidence was properly admitted under a *modus operandi* theory. *Id.*

It is apparent, then, that under Illinois law there is no requirement that other crimes be similar in all respects to the crime charged to be admitted under a *modus operandi* theory. Respondent is correct that the *modus operandi* case law is not directly applicable here since in that scenario the prosecution is seeking to introduce other crimes evidence against the defendant. (R. 19, Ans. at 27.) As Petitioner points out, however, the admission of *modus operandi* evidence would be subject to a *higher* standard than that used to assess the admissibility of third-party exculpatory evidence proffered by the defense. First, the defendant, unlike the prosecution, has a constitutional right to present evidence in his defense. *Holmes,* 126 S. Ct. at 1731; *Taylor,* 484 U.S. at 408; *see also United States v. McClure,* 546 F.2d 670, 673 (5th Cir. 1970) (lower standard of admissibility applies to defendant's proffered other crimes evidence due to defendant's "right to present a vigorous defense"); *United States v. Stamper,* 766 F. Supp. 1396, 1406 (W.D.N.C. 1991) ("the standard of admissibility when a criminal defendant offers similar

34

acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword"). Second, as the Illinois Supreme Court has itself recognized, admission of other crimes evidence by the defense does not pose the same risk of prejudice as does such evidence when offered by the prosecution. *See Cruz*, 643 N.E.2d at 653; *see also U.S. v. Cohen*, 888 F.2d 770, 777 (11th Cir. 1989) ("When the defendant offers similar acts evidence of a witness to prove a fact pertinent to the defense, the normal risk of prejudice is absent"). There can be no rational basis for permitting the prosecution to introduce other crimes evidence while prohibiting the defendant from using this same type of evidence in his defense.

In a similar vein, the state court based its decision to exclude the Wagner evidence on the fact that the description Siler gave of her attacker did not exactly match Wagner's appearance, since Wagner did not have a mustache at the time of his arrest. This fact seems of limited significance given that facial hair is not an immutable characteristic; two weeks passed between the attack on Siler and Wagner's arrest, during which time Wagner could have shaved. Moreover, the evidence was that Wagner matched Siler's description in all significant aspects, including his age, race, height, build, and the exact type of shoes he was wearing.[5]

The state court also pointed out that Wagner did not confess to the attack on Siler. The record reveals, however, that Wagner confessed to attacking Guzman, Weinstein, Johnson,

---

[5] Additionally, the state court was concerned that Siler was attacked with a box-cutter whereas Wagner had "apparently told authorities that he only used a knife and an ice pick in committing his crimes." (R. 6, Pet. Ex. B at 7-8.) Although state court factual findings are entitled to substantial deference, *see* 28 U.S.C. § 2254(e)(1), we do not find the state court's observance that Wagner "apparently" stated something to authorities a factual finding. Moreover, this statement is contradicted by the police records documenting their interviews with Wagner, which state: "He was asked if he had any other knives or weapons that he used when he stabbed these people. He stated that he did and that *one of the weapons* was an icepick that he had used." (R. 6, Pet. Ex. P (Police Report) at 9) (emphasis added).

35

Harwell and Hopp when questioned about these crimes by police. There is nothing in the record to suggest that police ever asked Wagner if he had attacked Siler.[6] Additionally, even if Wagner did not confess, this does not mean the evidence regarding his strikingly similar crimes was irrelevant.

Finally, the state court based its decision on the fact that defense counsel elected not to show Siler a photograph of Wagner and ask her whether Wagner was the man who attacked her. The trial court had ruled that although the defense could not put on evidence regarding Wagner's crime spree, defense counsel would be permitted to show Siler a photograph of Wagner and ask her if he was the man who attacked her. (R. 21, Record, Ex. I at B27.) At trial, defense counsel elected not to do so, although he did show Siler a photograph of Wagner's shoes, which she confirmed looked like the ones worn by her attacker. Defense counsel was not permitted to ask her whether those were the shoes worn by her attacker, and his renewed request to present the Wagner evidence to the jury was denied. (*Id.* at C115-17.) Counsel made the decision not to ask Siler if Wagner was the man who attacked her after it was clear he would not be permitted to put on any evidence regarding Wagner's crimes. (*See id.* at B27-28.) Additionally, by that point Siler had already made an in-court identification of Petitioner as her attacker. (*Id.* at C65.) Defense counsel's tactical decision not to show Siler a picture of Wagner's face during trial should not have any significance in determining whether the Wagner evidence should have been

---

[6] Nevertheless, as Petitioner points out, one of the police records dated March 15, 1997, references spontaneous statements by Wagner that he "stabbed a white woman at 35th and King Drive about two weeks ago." (R. 6, Pet. Ex. P at 8.) Although this is not the exact location of the Siler attack, it is six blocks away on the same strip of King Drive, and also reflects the correct time period of the attack. This statement does not match any of Wagner's other known attacks. It is unknown whether police followed up on this statement.

36

admitted by the trial court in the first place.

While the state court may permissibly exclude evidence that is "only marginally relevant," *see Holmes*, 126 S. Ct. at 1733, the evidence regarding Wagner's crime spree does not fit this description. After careful consideration, we cannot conclude that the state's interest in excluding unreliable or irrelevant evidence was materially advanced by the exclusion of the Jerryco Wagner evidence. Further, nothing in the state appellate court's opinion suggests, nor do we find any basis for concluding, that admission of the evidence would have unduly confused the jury or would have interfered with the court's ability to ensure orderly presentation of the case.

At the other end of the scale, we must "examine carefully the significance of the contested evidence to the defendant's case." *Johnson*, 844 F.32d at 484-85. The evidence regarding Wagner's crime spree was powerful defense evidence. Petitioner's defense at trial was that he did not attack Siler, that he had confessed after undue pressure from the police, and that he had been misidentified by Siler. Without the Wagner evidence, there was nothing to support Petitioner's defense except his own self-serving statements. With the addition of the Wagner evidence, the defense theory that someone else committed the crime becomes plausible. The evidence regarding the attack on Guzman was particularly compelling, as Guzman was attacked one day later, at the same time of night, six blocks away on the same strip of King Drive, and in a nearly identical manner as Siler.

Ironically, during closing argument the prosecutor scoffed at Petitioner's contention that he was misidentified, repeatedly stating that Petitioner wanted the jurors to believe his "evil twin" was loose on the city committing crimes. (R. 21, Record, Ex. I at E225.) He stated:

37

> This man is so unlucky that his evil identical twin knows that the very
> next day at approximately the very same time this defendant is going
> to show up at 29th and King, be at a bus stop wearing a black jacket
> just like the evil twin was wearing the day before, wearing a black cap
> just like the evil twin was wearing the day before, a sweatshirt with a
> hood just like the evil twin was wearing the day before, black pants,
> just like the evil twin was wearing the day before, and black shoes just
> like the evil twin was wearing the day before. . . . That's how unlucky
> this man is, but it gets worse. Because this evil twin is also 5 foot 7,
> he also has a mustache, he's also thin build. Unbelievable. And it is
> unbelievable, it's what they want you to believe.

(*Id.* at E225.) As it turns out, Wagner could conceivably be characterized as Petitioner's "evil twin," in that he closely matched Petitioner's physical description, was wearing the same type of clothing, and admitted to carrying out a series of unprovoked stabbing attacks on white people within the same geographic area and during the same time period as the attack on Siler. The jury was never allowed to hear this powerful evidence. The court agrees with Petitioner that the exclusion of the Jerryco Wagner evidence gutted his ability to rebut the prosecution's case.

In sum, balancing the state court's apparent justification for excluding the Wagner evidence against the significance of this evidence to Petitioner's case, we conclude that the state court's exclusion of the evidence violated Petitioner's Sixth Amendment right to present a complete defense.

## D.     Harmless Error Review

A federal court may not grant habeas relief, notwithstanding a constitutional error by the state court, unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). When a federal habeas court is in "grave doubt" regarding whether a trial error had a substantial or injurious effect on the jury's verdict, the error was not harmless. *O'Neal v. McAninich*, 513 U.S. 432, 436 (1995).

As discussed above, the state court excluded powerful evidence that would have given strong support to Petitioner's defense theory. The Respondent argues that other evidence of Petitioner's guilt was "overwhelming," such that exclusion of the Wagner evidence could not possibly have had a substantial and injurious effect on the jury's verdict. (R. 19, Ans. at 31.) We disagree. No physical evidence was ever found linking Petitioner to the crime. The absence of any blood evidence in this case is particularly perplexing, since Siler told police that Petitioner was wearing the same coat at the time of his arrest that he was wearing during the attack. The evidence was that Siler was bleeding profusely from her injuries, and her testimony was that her attacker had his arm wrapped around her neck, and that they struggled for several minutes while he was cutting her. Yet no blood was found on Petitioner's coat or any of his other clothing.

Motive was also fundamentally lacking in this case. There was little evidence showing any motive—economic or otherwise—for Petitioner to attack Siler. The state's theory that Petitioner was upset about Siler's tobacco comment was flawed because Siler did not testify about any verbal exchange with her attacker regarding cigar smoke. When this motive evidence is balanced against Wagner's declared objective to attack any white person he encountered, this Court simply cannot conclude that the exclusion of the Wagner evidence was harmless.

Additionally, although Petitioner was identified by Siler from a photographic array, he was not an exact match of the description she had given police, since he was 20 years older than the age she had given for her attacker. As Petitioner points out, it is possible that Siler may have recognized him not because he attacked her but because the two frequented the same bus stop on

an almost daily basis.[7] Moreover, the evidence was that Jerryco Wagner was a close match to Petitioner in terms of general appearance, height, and build. Although Siler identified Petitioner from the photographic array, Wagner was not included in that array. It is difficult to predict how different the outcome of this case might have been if Siler had been shown a photographic array which included both Wagner and the Petitioner before she committed herself to the identification of Petitioner.

Further, although Petitioner ultimately confessed, he maintained his innocence for many hours during his detainment. His testimony was that he was unduly pressured to confess after almost 30 hours in custody; that he was feeling ill and needed his blood pressure medication; that he was afraid the police were going to beat him and that one officer slapped him during the interrogation. Petitioner's testimony was that he feared he would not survive a beating by police. Notably, moreover, Petitioner's confession did not match the victim's testimony in a very key aspect: he stated in his confession that he attacked Siler because she made a comment to him about the cigar he was smoking. By contrast, Siler's testimony was that the man attacked her without warning or provocation after asking her how long she had been waiting for the bus. Despite giving a detailed, coherent account of her attack, Siler mentioned nothing about her

---

[7] The Court also notes that legal observers have long recognized the difficulties posed by cross-racial eyewitness identifications. While the issue is a matter of debate, research has shown that an eyewitness is more likely to accurately identify someone of his or her own race than someone of a different race. Because of cross-racial bias, people apply more lenient criteria in identifying someone of a different race or ethnicity, while using more stringent requirements for making an identification of someone of the same racial or ethnic group. The result of cross-racial bias is a higher rate of false positive identifications, especially when a white eyewitness identifies an African-American suspect. *See, e.g.* Heather M. Kleider & Stephen D. Goldinger, *Stereotyping Ricochet: Complex Effects of Racial Distinctiveness on Identification Accuracy*, 25 Law & Human Behav. 605 (2001); Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases*, 69 Cornell L. Rev. 934 (1984).

attacker smoking a cigar, nor did she mention exchanging any words with him other than regarding how long she had been waiting for the bus. Siler's version, that there was no apparent provocation for the attack, was bolstered by the testimony of the emergency room nurse, who said that when she asked Siler what had happened Siler replied, "He came up and cut me and I don't know why." (R. 21, Record, Ex. I at C122.) Siler's version matches the scenario of Wagner's other attacks.

Even in the absence of the Wagner evidence, it was apparently a close case for the jury. A month after the jury's verdict, one of the jurors sent a notarized letter to the trial judge stating that she felt she had been unduly pressured by the other jurors into changing her vote to guilty. Admission of the Wagner evidence would have lent credibility to Petitioner's contentions that someone else committed the crime and may very well have tipped the scale in his favor. After careful consideration of the entire record, the court is in "grave doubt" as to whether the state court's error in excluding the Wagner evidence had a substantial and injurious effect on the jury's verdict. As such, the error cannot be considered harmless.

## CONCLUSION

For the reasons set forth above, the Court concludes that Petitioner's Sixth Amendment claim is not procedurally defaulted. Accordingly, Petitioner's request to conduct discovery and for an evidentiary hearing to develop his argument that an exception to the procedural default doctrine applies is denied as unnecessary. (R. 23.) The Court further concludes that Petitioner has satisfied the standards for relief set forth in 28 U.S.C. § 2254(d), and accordingly, the petition for a writ of habeas corpus is granted. (R. 1.) Respondent shall release Petitioner unless the State of Illinois initiates proceedings to retry him within 90 days of the date of this order.

41

This Court fully realizes that this ruling may rekindle the tragic emotional and physical trauma suffered by Siler; however, our legal system requires that any person held accountable for this terrible crime be accorded a fair trial under the Constitution. With due deference to our state court colleagues, Petitioner's trial was neither fair nor conducted in a constitutional manner.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: October 20, 2006**